**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| CHASE FROST | CIVIL ACTION |
|---|---|
| v. | NO. 17-3869 |
| CITY OF PHILADELPHIA | |

## MEMORANDUM RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**Baylson, J.**                                                        **June 17, 2019**

This discrimination case arises from Plaintiff Chase Frost's employment as a Fire Services Paramedic cadet for the Philadelphia Fire Department in 2016. Frost asserts that he was discriminated against when he was prevented from entering the Fire Academy cadet class in October 2015, that he was discriminated against when he was wrongfully terminated from the 2016 cadet class, that he was subjected to a hostile work environment at the Fire Academy, and that he was retaliated against after he filed a complaint with the EEOC. Defendant City of Philadelphia now moves for summary judgment on Frost's claims. (Mot., ECF 24.)

For the reasons that follow, Defendant's Motion is granted.

### I.    Undisputed Material Facts

In August 2007, Plaintiff became disabled while performing a fire rescue as a volunteer firefighter with the Delaware County Parkside Fire Company. Am. Compl., ECF 3 at ¶¶ 19-20. As a result of that incident, Plaintiff's left arm and right leg were amputated and fitted with prosthetics, and his body was severely burned, leaving visible cars over 60% of Plaintiff's body including his head, neck, right arm and left leg. Id. at ¶¶ 21-22. Plaintiff is a licensed and certified paramedic in both the State of Pennsylvania and with the National Registry of Emergency Medical Technicians, with over five years of experience and over 1,100 hours of

field internship experience. Id. at ¶ 29.

**A. Application for the 2015 Fire Service Paramedic Cadet Class**

Plaintiff applied to be a Fire Service Paramedic ("FSP") with the City of Philadelphia

Fire Department ("PFD") on October 6, 2014. Am. Compl. at ¶ 30; Mot. Ex. E. Plaintiff took the

exam to qualify for the FSP position and was invited to attend orientation the 32nd FSP cadet

class on July 7, 2015. Frost Dep., Mot., Ex. C at 19:19-20:5. After attending orientation, on July

21, 2015, Plaintiff was interviewed by City of Philadelphia EEO Officer William Twardzik and

PFD Deputy Commissioner ("DC") Diane Schweizer. Mot. Exs. H-J. DC Schweizer was aware

that Plaintiff had prosthetic limbs and had requested accommodations. Schweizer Dep., Mot. Ex.

K at 15:10-18:4. DC Schweizer typically does not conduct interviews of candidates herself. Id. at

15:10-12, 20:2-19.

During the meeting with Twardzik and DC Schweizer, Plaintiff discussed his disability

and the accommodations he would need in order to perform the essential functions of the

Paramedic position. Plaintiff requested permission to use a video laryngoscope he already owned

and to be fitted for special bunker gear. See Frost Dep. at 21:16-25:9. On July 29, 2015, PFD

offered Plaintiff a conditional appointment to the position of FSP cadet. Mot. Ex. L. The

appointment was conditioned upon successful completion of a medical examination and

verification of background. Id. On July 29, 2015, Plaintiff was measured for bunker gear as part

of his uniform. Am. Compl. at ¶ 40. The next day, on July 30, 2015, Plaintiff requested

accommodations regarding the uniform boots and coat. Id. at ¶ 41.

On or around August 7, 2015, as part of Defendant's application process, Plaintiff

underwent a medical evaluation by Dr. Hayes in the City's Employee Medical Services

department. Mot. Ex. M. Employee Medical Services must evaluate and approve all new

Philadelphia Fire Academy FSP cadets before they can begin training or work. Hayes Dep., Mot. Ex. N at 9:10-10:7. During the evaluation Dr. Hayes and Plaintiff discussed Plaintiff's disability and requested accommodations. Am. Compl. at ¶¶ 44-46. At the conclusion of the evaluation the status of Plaintiff's application was under "reconsideration", meaning that Plaintiff was neither approved nor rejected, but rather required additional evaluation. Hayes Dep. at 54:23-56:22. Dr. Hayes did not provide further explanation on the nature of Plaintiff's reconsideration, but requested the opinions of Plaintiff's physicians, Dr. Haith and Dr. Lax, regarding whether they believed Plaintiff could perform the job duties of an FSP cadet. Mot. Ex. O.

During one of his meetings with Dr. Hayes, Plaintiff alleges that Dr. Hayes instructed him to "think really hard" about whether he wanted to proceed in applying to be an FSP. Am. Compl. at ¶ 61. Dr. Hayes was professional during the meeting when he made this comment. Frost Dep. at 30:12-32:17. In Dr. Hayes deposition, he testified that he told Plaintiff that

> Going through the academy I have no doubt that you can be successful. But there are going to be difficulties that you have, Chase, beyond the academy. There are going to be people out there who just because of the limitations you have that are going to think that you are not going to be successful or not be the one that they might want you to work on them and/or their loved ones. And this is something that requires emotional strength. So you need to understand that this thing is going to go on beyond here. So you have to understand, people are always going to look at you different if you are different, and I may have said that to Chase. I think I did.

Hayes Dep. at 64:7-23.

Dr. Haith sent his evaluation of Plaintiff to Dr. Hayes on August 24, 2015. Mot. Ex P. Dr. Lax sent her evaluation of Plaintiff to Dr. Hayes on September 28, 2015. Mot. Ex. Q. On October 19, 2015, Dr. Hayes faxed a request to Physical Therapist Dr. Jill Galper to evaluate Plaintiff as to his functional capacity to perform the Skills Proficiency Standards that FSP cadets

must complete. Mot. Ex. R. On January 5, 2016, Dr. Galper requested to use the actual equipment that cadets are required to use at the Fire Academy as part of her assessment. Mot. Ex. S.

On or about January 12, 2016, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") alleging he was discriminated against as a result of his disability. Am. Compl., Ex. 1.

Dr. Galper evaluated Plaintiff on March 15, 2016 and March 24, 2016. Mot. Ex. T. In her report, Dr. Galper noted that Plaintiff "demonstrated sufficient safety and ability in transitioning into various positions, walking, running and climbing stairs to participate in the Philadelphia Fire Academy Paramedic Training Program." Id. She recommended accommodations for running, burpees, squats, the overhead press and pull-ups. Id.

### B. Application for the 2016 Fire Service Paramedic Cadet Class

On April 22, 2016, the Department notified Plaintiff that it had certified him as a potential candidate for the 33rd Paramedic class. Mot. Exs. U & V. On May 3, 2016, the Department contacted Plaintiff to schedule his interview with the Department. Mot. Exs. W & X. On May 10, 2016, PFD offered Plaintiff a conditional appointment to the position of Paramedic. Mot. Ex. Y. The appointment was conditional upon successful completion of a medical examination and background check. Id.

On May 17, 2016, Plaintiff submitted to the Department and Dr. Hayes a fourteen-point list of "reasonable accommodations" he believed were required to perform the essential functions of a Fire Services Paramedic. Mot. Ex. Z. The requested accommodations were: bunker gear—custom coat and boots that worked with his prostheses, use of a video laryngoscope, spinner

knob for driving, accommodations with running, push-ups, burpees, squats with forty pounds, and pull-ups, and accommodations with three FSP evolutions[1]—the "Reeves Stretcher Carry," the "Stair Chair Carry," and the "Stretcher Operation." Id.

Dr. Hayes evaluated Plaintiff again on May 19, 2016. Mot. Ex. BB. Dr. Hayes approved Plaintiff to participate in the Philadelphia Fire Academy Paramedic Training Program on May 20, 2016. Mot. Ex. CC. On August 26, 2016, PFD sent Plaintiff a letter advising him that he had been selected for a probationary appointment to the position of paramedic with PFD's 33rd Paramedic Class. Mot. Ex. DD.

### C. Employment at the Fire Academy

Plaintiff began his first day at the Fire Academy as a probationary employee on September 12, 2016. Mot. Ex. DD. On September 13, 2016, Plaintiff did not appear for training due to swelling in his right lower extremity that he experienced after training. Mot. Ex. EE. Department staff visited his home and explained that he must get a doctor to certify his condition for the absence to be excused. Mot. Ex. FF; Mot. Ex. GG. Plaintiff's physician Dr. Haith evaluated Plaintiff on September 14, 2016 and noted that Plaintiff sustained trauma during a training exercise at the Fire Academy on September 12, 2016. Mot. Ex. HH. Dr. Haith cleared Plaintiff to return to work that day. Id.

Plaintiff asserts that on one occasion, Lt. Joseph DiCicco, an FSP and Fire Academy instructor, "gawked" at Plaintiff's limb in the locker room. Am. Compl. at ¶ 88. Plaintiff also alleges that on or around September 16, 2016, Lt. DiCicco commented to the cadet class that burn patients are "disgusting." Frost Dep. at 42:5-18.

Pursuant to the Philadelphia Fire Academy Guide Book Cadet Code of Conduct,

---

[1] Evolutions are the PFD skill sheet of tasks. Frost Dep. 46:18-21.

employment as a Philadelphia FSP is contingent upon, among other things, achieving an average score of 80% on Protocol Quizzes. Mot. Ex. JJ; Resp., Ex. 16 (hereinafter "FSP Cadet Code of Conduct"). Cadets are notified prior to commencing training at the Fire Academy, that they are permitted one re-test if they fail a protocols quiz. FSP Cadet Code of Conduct. The policy reads:

> In order to graduate, I must pass **ALL** written and practical examinations/quizzes. In the event that an examination/quiz is not passed, one (1) re-test will be permitted. The re-test score **WILL NOT** be included in the computation for any academic award competition. I understand that if I fail the re-test exam or fail to achieve the minimum standards listed above, I may be REJECTED FROM EMPLOYMENT.
>
> Additionally, if I fail three (3) quizzes under the topics of "Protocol Quizzes" or General Knowledge quizzes, I **may** be REJECTED FROM EMPLOYMENT at the discretion of the Fire Academy Command Staff.

Id.

On September 21, 2016, Plaintiff scored a 70% on Protocol Quiz 1, failing to meet the minimum academic score of 80%. Mot. Ex. MM. As a result of failing Protocol Quiz 1, Plaintiff received "remediation" that day where Fire Academy staff met with Plaintiff and the other cadets who failed to review their answers and justifications for the Protocol Quiz 1. Stallings Dep., Mot. Ex. LL at 127:23-128:2; Mot. Ex. JJ. The Department offered additional tutoring to Plaintiff and other cadets who had failed the quiz additional tutoring for the Protocol Quiz before the re-test, but Plaintiff did not avail himself of the additional tutoring. Stallings Dep. at 157:23-158:16. On September 22, 2016, Plaintiff took the re-test for Protocol Quiz 1 and received a score of 70%. Mot. Exs. JJ & MM.

The Department rejected Plaintiff from probationary employment on September 22, 2016. Mot. Ex. NN.

## II.     Procedural History

Plaintiff filed his Complaint in this Court on August 29, 2017 (ECF 1), and amended his Complaint on October 31, 2017 (Am. Compl.). The Amended Complaint alleges that Defendant subjected Plaintiff to discrimination and retaliation on the basis of his disability and subjected him to a hostile work environment in violation of the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA") (Count I), the Pennsylvania Human Rights Act ("PHRA") (Count II), and the Philadelphia Fair Practices Ordinance ("PFPO") (Count III). Defendant answered the Amended Complaint and asserted affirmative defenses on December 29, 2017. Answer, ECF 6.

After discovery, Defendant filed a Motion for Summary Judgment on December 11, 2018. Mot., Exhibits at ECF 25. Plaintiff responded in opposition on January 28, 2019. Resp., ECF 27. Defendant replied (Reply, ECF 30), and Plaintiff surreplied (Surreply, ECF 33).

The Court held oral argument on May 6, 2011, and requested supplemental briefs from the parties on the topics of comparators, and Plaintiff's hostile work environment and failure to accommodate claims. Plaintiff docketed his letter (ECF 38), and Defendant sent its letter to chambers and to Plaintiff.

## III.     Summary Judgment Standard

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id. Under Federal Rule of Civil Procedure 56, the Court must

view the evidence presented on the motion in the light most favorable to the opposing party.  Id.
at 254.

A party seeking summary judgment always bears the initial responsibility for informing
the district court of the basis for its motion and identifying those portions of the record that it
believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett,
477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular
issue at trial, the moving party's initial burden can be met simply by "pointing out to the district
court [that] there is an absence of evidence to support the non-moving party's case."  Id. at 325.

After the moving party has met its initial burden, the adverse party's response must, "by
affidavits or as otherwise provided in this rule, [] set forth specific facts showing a genuine issue
for trial."  Stell v. PMC Techs., Inc., No. 04-5739, 2006 WL 2540776, at *1 (E.D. Pa. Aug. 29,
2006) (Baylson, J.) (citing Fed. R. Civ. P. 56(e)); Matsushita Elec. Indus. Co. v. Zenith Radio
Corp., 475 U.S. 574, 586–87 (1986) (The nonmoving party "must do more than simply show that
there is some metaphysical dispute as to the material facts.").  Summary judgment is appropriate
if the adverse party fails to rebut by making a factual showing "sufficient to establish the
existence of an essential element to that party's case, and on which that party will bear the
burden of proof at trial."  Celotex, 477 U.S. at 322.

IV.    **Discussion**

A.  **Disability discrimination**

The ADAAA prohibits "discriminat[ion] against a qualified individual on the basis of
disability in regard to…the hiring, advancement, or discharge of employees, employee
compensation, job training, and other terms, conditions, and privileges of employment." 42
U.S.C. § 12112(a).  The PHRA makes it unlawful "[f]or any employer because of the…non-job

related handicap or disability…to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual…if the individual…is the best able and most competent to perform the services required." 43 P.S. § 955(a). The PFPO makes it unlawful "to deny or interfere with the employment opportunities of an individual based upon his or her…disability," including hiring and firing decisions. P.C. § 9-1103(1).

Plaintiff's discrimination claims under these three statutes are subject to the three-part burden-shifting framework set out in <u>McDonnell Douglas Corp v. Green</u>, 411 U.S. 792 (1973) and can be analyzed together. <u>See</u> <u>Taylor v. Phoenixville School Dist.</u>, 184 F.3d 296, 306 (3d Cir. 1999) (PHRA discrimination claims are subject to same analysis as ADA discrimination claims); <u>Joseph v. Continental Airlines, Inc.</u>, 126 F.Supp.2d 373, 379 n.3 (E.D. Pa. 2000) (Joyner, J.) (PFPO claims are analyzed under the same framework as Title VII claims).

A plaintiff faces the initial burden of establishing a prima facie case of unlawful discrimination. <u>McDonnell Douglas</u>, 411 U.S. at 802. If a prima facie case is successfully established, the defendant then must articulate some legitimate, nondiscriminatory reason for the Plaintiff's adverse treatment. <u>Id.</u> at 802-803. Finally, if the defendant successfully puts forth such reasons, the plaintiff must demonstrate that those reasons are merely pretext for unlawful employment discrimination. <u>Id.</u> at 804-805.

To make out a prima facie case under the ADA, an employee must establish that he "(1) has a 'disability,' (2) is a 'qualified individual,' and (3) has suffered an adverse employment action because of that disability." <u>Turner v. Hershey Chocolate U.S.</u>, 440 F.3d 604, 611 (3d Cir. 2006). Defendant accepts that Plaintiff is disabled and thus satisfies prong one, but asserts that Plaintiff does not satisfy prongs two or three. Mot. at 5.

A "qualified individual" is a person "who, with or without reasonable accommodation,

can perform the essential functions of the employment position that such individual holds or desires." Turner, 440 F.3d at 611 (quoting 42 U.S.C. § 1211(8)). Pursuant to EEOC guidance, this inquiry has two parts: "(1) whether the individual has the requisite skill, experience, education, and other job-related requirements of the position sought, and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that job." Id. (citing 29 C.F.R. § 1630.2(n)). The determination of whether a person is qualified is made "at the time of the employment decision, and not at the time of the lawsuit." Id.

Plaintiff presents a failure to hire claim as well as a wrongful termination claim. We address each in turn.

### i. Plaintiff's failure to hire claim – 2015

Plaintiff claims that Defendant discriminated against him by failing to hire him as part of the 32nd FSP cadet class in 2015 "after Defendant expressed (unfounded) doubt about his abilities to perform the job and reluctance in providing Plaintiff with accommodations that would allow him to perform the essential functions of his job." Resp. at 5. Plaintiff argues that he was treated differently because he was interviewed by the Deputy Commissioner who normally does not conduct interviews, and because he was required to get clearance from medical doctors as an initial step, unlike other cadets. Id. at 5, 7-8.

Plaintiff also contends that he was not given a justification for his delayed start at the Fire Academy, but rather that Dr. Hayes requested that he obtain the opinion of his medical doctors that he could perform the essential functions of the FSP position. Id. at 7. The two opinions Dr. Hayes initially requested—from Dr. Haith, Plaintiff's physician, and Dr. Lax at Magee Rehabilitation Hospital—were returned to Dr. Hayes before the start of the 32nd class, on August 24, 2015 and September 28, 2015, accordingly. At a meeting after receipt of those

reports, Dr. Hayes told Plaintiff to "think really hard" about whether to proceed in applying to the PFD, and Plaintiff testified that he understood this statement was intended to discourage him from applying. Id. at 9. Dr. Hayes also requested that physical therapist Dr. Galper evaluate Plaintiff's ability to perform certain skills, and her evaluation was not sent to Dr. Hayes until March 24, 2016. Reply at 3.

Defendant appears to attack Plaintiff's prima facie case, claiming that he was not qualified before he was medically cleared. Reply at 3. Defendant's purported legitimate, non-discriminatory reason for not permitting Plaintiff to begin as part of the 32nd FSP class was that it had not received the required medical clearances as the date the class was set to begin. Id. Plaintiff argues that this reason is pretextual because "Dr. Hayes already had the requisite information to approve Plaintiff weeks earlier." Resp. at 11. Plaintiff responds that "Defendant admits that Ms. Galper's March 2016 report did not address any of the alleged deficiencies in the examinations provided by Plaintiff's physicians over six (6) months earlier." Surreply at 2. Dr. Hayes testified that any applicant who had a medical condition had to provide a note of clearance from his or her medical doctor before being admitted to the Academy. Hayes Dep. 34:18-36:16.

Defendant replies that Plaintiff "misrepresents the record" because "it was Plaintiff[] who initially offere[ed] his own physician recommendations supporting his assertions that he could physically do the job." Reply at 2. Defendant asserts that "[f]urther testing and evaluations by Dr. Hayes and by Dr. Haith, Dr. Lax, and Dr. Galper at the request of Dr. Hayes are evidence of thorough due diligence to assure that a cadet with disabilities more substantial than anything the City had previously experienced could safely and effectively do the job." Id.

Plaintiff has not demonstrated that he can state a prima facie case for his failure to hire claim; in particular, he has not shown that he was qualified to do the job *at the time* that the 32nd

paramedic class began. See Turner, 440 F.3d at 611. Although he was eventually able to demonstrate that he was physically capable of being a cadet, so much so that he was accepted into the 33rd paramedic class in 2016, this was not known to the Defendant in October of 2015. Rather, at this time, Defendant was engaged in a good faith interactive process to determine whether and how Plaintiff could perform the FSP cadet position. See, e.g. Dr. Hayes Dep. 100:15-21 ("Because of his limitations, he's at much greater risk of failing and/or injuring himself profoundly and/or someone else. So you want to make sure before you put him up at the academy that he at least has the base modicum of a potential to complete this process successfully.") Although it appears that Dr. Galper's report did not address the issues the City had hoped it would address, it is apparent from the record that the City anticipated the report to address new information.

Even if we assume that Plaintiff could have made out a prima facie case, we are convinced that the Defendant's legitimate non-discriminatory reason for this delay—that it wanted to ensure that an employee with Plaintiff's disabilities could perform the job safely and effectively—was not pretextual. Plaintiff has not put forward evidence demonstrating that the Defendant's delay in admitting him into the 32nd FSP class was motivated by discrimination. Accordingly, we will grant summary judgment on this claim.

### ii. Plaintiff's 2016 wrongful termination claim – September 2016

We next address Plaintiff's termination from the Fire Academy in September 2016.[2] We analyze this claim under the McDonnell Douglass burden-shifting framework laid out above.

---

[2] For purposes of this memorandum, the Court uses the word "termination," although we understand that there is a dispute about whether this is an accurate since Plaintiff was in probationary unemployment.

## 1. Prima facie case

As noted above, to make out a prima facie case under the ADA, an employee must establish that he "(1) has a 'disability,' (2) is a 'qualified individual,' and (3) has suffered an adverse employment action because of that disability." Turner v. Hershey Chocolate U.S., 440 F.3d 604, 611 (3d Cir. 2006). Defendant asserts that Plaintiff is not qualified to be an FSP cadet because he did not pass the protocol re-test, a prerequisite of employment at the Academy. Mot. at 6. Defendant appears to accept that Plaintiff had the educational background and skills necessary to perform the position of FSP cadet. Plaintiff responds that he is qualified because of his "educational background, [including] his Paramedic Certification, degree from Thomas Jefferson University [and] field internship with the City." Resp. at 23.

Plaintiff has carried his burden of establishing a prima facie case with regard to this claim. Defendants do not appear to dispute the first or third elements of a prima facie case—that Plaintiff was disabled and that he suffered an adverse employment action when he was terminated from his position as an FSP cadet. As to the second element, this Court accepts that based upon Plaintiff's academic credentials and Defendant's acceptance of Plaintiff into the Academy, Plaintiff was qualified to perform the position of FSP cadet. Defendant's arguments regarding Plaintiff's qualifications relate more to Defendant's defense of its own legitimate, non-discriminatory reason.

## 2. Defendant's legitimate, non-discriminatory reason

Once Plaintiff makes out a prima facie case, "[t]he employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). Defendant states that it "rejected [Plaintiff] from the Fire

Academy, in accordance with the PFD policy and practice, for failing the retest of the first protocols quiz." Mot. at 16. Defendant introduces evidence of this policy and Plaintiff's termination under it. See Mot Exs. KK (Academic Policy), MM (spreadsheet of all cadets and scores), JJ & NN (internal PFD memoranda discussing Plaintiff's rejection). Plaintiff does not contest that he failed the retest, but rather argues that his termination was pretext for discrimination.

### 3. Pretext

Plaintiff asserts that Defendant's stated reason for terminating him—that he did not pass the re-test—is pretext for discrimination because he was treated differently than others in his cadet class. Resp. at 20-26. Plaintiff asserts that there were other cadets who were similarly situated to him but were treated better, and that he was not given the opportunity to succeed on his protocol quiz because he was pulled out of class to be fitted for accommodations. Resp. at 20. Both of these arguments are addressed below.

### a. Comparator evidence

There are two relevant Fire Academy policies at issue with the alleged comparator evidence presented by Plaintiff. Both are outlined in the "PFD Academic Testing Requirements: Fire Service Paramedic Cadets." FSP Cadet Code of Conduct. First, and the portion of the Academy Policy which Plaintiff himself was terminated for violating, reads that "In order to graduate, I must pass **ALL** written and practical examinations/quizzes. In the event that an examination/quiz is not passed, one (1) re-test will be permitted." Academy Policy. The second portion of the Academy Policy that Plaintiff discusses is the requirement that "An overall average of 80% must be achieved in the Protocol Examination – Protocol Final examination will

not be included." Id. The policy also reads that the "re-test score **WILL NOT** be included in the computation for any academic award competition." Id.

Plaintiff alleges that this policy was enforced unevenly. He provides the example of Cadet Donna Mobley-Thomas, who was permitted to continue in the Academy even though she received scores of 85, 75, and 55 on the first three of the four Protocol Quizzes and thus could not statistically reach the 80% overall average score. Resp., Ex. 17. Plaintiff asserts that neither Lt. Singleton nor Lt. Donahue, who kept track of cadet scores, "could answer why Cadet Mobley-Harris was permitted to continue in the Fire Academy even though she would never be able to meet the City's alleged mandates." Resp. at 23. Plaintiff admits, however, and Defendant points out, that Mobley-Thomas eventually did fail out of the Fire Academy, but alleges it was a result of her Final Practical, rather than a failure to obtain an average of 80% on protocol quizzes. Resp. at 23-24. Plaintiff also argues that other cadets were given the opportunity to be placed on academic warning after failing protocol quiz, an option that was not made available to Frost. Resp. at 24.[3]

Defendant responds that it has evenly applied both policies and that the PFD has rejected every cadet who fails the re-test of a protocol quiz. Reply at 6. Defendant thus argues that the other cadets who failed the first protocol quiz but went on to pass the re-test are not proper comparators "because they were not permitted to continue at the Fire Academy after failing a retest." Id. Defendant argues that the 80% average score rule is a separate policy and that Plaintiff is improperly conflating the two policies. Id.

---

[3] Frost did testify, however, that he was placed in the "Cadet Adjustment Program," which he interpreted as a "warning, like a red flag." Frost Dep. 54:9-24. The Court is unclear if this Program is the same as what Plaintiff refers to as an "academic warning."

The issue here is whether the non-disabled cadets who were permitted to continue at the academy are proper comparators for Frost. A comparator must be "similarly situated in all respects." In re Tribune Media Co., 902 F.3d 384, 403 (3d Cir. 2018) (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)). Being subject to the same supervisor or subjected to the same standards are factors the court considers in evaluating comparators. Hatch v. Franklin Cty., 755 F. App'x 194, 199 (3d Cir. 2018). In the comparable context of evaluating a claim under New Jersey's anti-discrimination law, the Third Circuit has stated that the determination of comparators "requires the court to undertake a fact-intensive inquiry on a case-by-case basis rather than a mechanistic and inflexible manner." Monaco v. American General Assur. Co., 359 F.3d 296, 305 (3d Cir. 2004).

Here, the individuals most similar to Plaintiff were the FSP cadets who also failed the first protocol quiz. Plaintiff does not contend that any other cadet failed the re-test like he did. These individuals, although subject to the same policy as Plaintiff, are not similarly situated to him because they each passed their re-test. Thus, these individuals are not proper comparators.

Although the 80% average score policy was not the policy under which Plaintiff was terminated, it is possible that this policy should have led to Mobley-Thomas being fired earlier than she was. It would not have become apparent to the Academy that she was going to obtain a lesser average score than 80% until after the third protocol quiz. There is no evidence before the Court about the enforcement of this policy, as this is not the issue in Plaintiff's case. For example, the Court is unaware of whether the termination under that portion of the policy occurs at the moment it becomes apparent that the cadet will not obtain an 80% average, or after all protocol quizzes and the final examination are completed. The Court also does not have specific factual evidence about Mobley-Thomas's termination from the Academy. We need not opine on

this issue, however, as the policy before us is the re-test policy under which Plaintiff was terminated. Under that policy, no similarly situated non-disabled FSP cadets were treated more favorably than Plaintiff.

### b. Whether Defendant deprived Plaintiff of opportunities for academic success

Plaintiff also asserts that he was not provided the tools to successfully pass the protocol quiz. Plaintiff alleges that he was unable to participate in the tutoring because "he was dealing with an issue related to his prosthetics," and that he was "pulled out of class constantly and every day" and therefore "did not have all the information he needed to succeed on the quizzes." Resp. at 21-22. Plaintiff therefore asserts that Defendant "failed to provide Plaintiff with additional support, opportunity, and time to pass the Protocols Quiz, after he missed more lectures and presentations than other cadets because of his disability." Resp. at 21.

When asked about his reasons for missing the tutoring session, Plaintiff testified that

> I was getting up at 2:00 in the morning to get ready for the academy every morning, and taking notes on everything that was going on when I got home, and I had to prepare. We were only given, I believe, two sets of PT, uniform stuff, so I had to continually do laundry during the week, also. So, obviously between taking notes, doing laundry, eating dinner, bathing, getting up early, you know, and normal household stuff, I had to make sure and get everything ready.

Frost Dep. at 71:19-72:5.

Plaintiff additionally testified that he had to go obtain a second back-up liner for his prosthesis that night, because "I felt the sooner I dealt with it, the better. Frost Dep. 72:6-73:1. Plaintiff has not asserted that he informed Defendant why he had to miss tutoring or that he requested additional time or assistance in preparing for the re-test that he eventually failed.[4]

_____

[4] Plaintiff did not explain his rationale for missing tutoring in his termination meeting, according

Defendant replies that Plaintiff was provided copies of the protocols at orientation and that Plaintiff was a registered paramedic in Pennsylvania so should have been able to pass the exam. Reply at 7. Moreover, Defendant asserts that Plaintiff has "failed to establish that he actually missed protocol instruction during any of the class time." Id.

### c. Pretext analysis

When a legitimate, non-discriminatory reason is put forward by an employer, "the only remaining question would be whether respondent could produce sufficient evidence from which a jury could conclude that 'petitioner's stated reason for respondent's rejection was in fact pretext.'" Raytheon Co. v. Hernandez, 540 U.S. 44, 55 (2003) (quoting McDonnell Douglas, 411

---

to the notes produced by Defendant. In that internal memorandum, H. Jay Singleton, FLP, the coordinator of the FSP 33rd Class, explained the interaction at the termination meeting:

> Cadet Frost then stated he felt we didn't tutor him enough. It was explained to him that he was re-mediated yesterday and instructors voluntarily stayed after work last night for tutoring (which all cadets were advised of) and Cadet Frost did not take advantage of the offered tutoring. He admitted he did not stay and did not have time to study last night because he had "something to take care of." Cadet Frost was reminded that he was given the protocols 3 months ago at orientation and was told to study them. At orientation, he was also advised of our expectations and the fast pace of our training program. At that point he stated he was at orientation 2 years ago and was given the protocols. Lt. Donahue and I proposed, he had longer to study and therefore had no excuse for not knowing the protocols. He further argued that we should give cadets at least 2-4 days before taking a re-test to facilitate a more positive outcome and give the cadets more time to prepare. Lt. Donahue and I explained to him that we are not here to teach him how to be a paramedic. . . . Cadet Frost was asked, what if he gets a call for a patient who falls under the section of the protocols that you failed. He stated that the patient could die. He was further asked, "when the family's lawyers sue and request your training records and see that it took 5 attempts to pass the test on that section of the protocols, what will happen? He stated that it's a liability, I understand.

Mot. Ex. NN.

U.S. at 804). "[T]he evidence [a] plaintiff proffers [to establish pretext] must meet a heightened 'level of specificity' to survive summary judgment." <u>Jackson v. Planco</u>, 660 F. Supp. 2d 562, 577 (E.D. Pa. 2009) (Dalzell, J.), aff'd, 431 F. App'x 161 (3d Cir. 2011) (quoting <u>Simpson v. Kay Jewelers</u>, 142 F.3d 639, 646 (3d Cir. 1998)). "To discredit the employer's proffered reason, … the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." <u>Fuentes</u>, 32 F.3d at 765. A plaintiff must produce sufficient evidence to demonstrate "such weaknesses, implausabilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." <u>Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 504 (3d Cir. 1997) (quoting <u>Fuentes</u>, 32 F.3d at 764. "To avoid summary judgment, the plaintiff must point to some evidence from which a factfinder could reasonably conclude that the plaintiff satisfied the criterion that the decisionmakers disapproving of him relied upon (e.g. by showing that others no more qualified than he under that criterion were not treated adversely), or that the decisionmakers did not actually rely upon that criterion." <u>Fuentes</u>, 32 F.3d at 767.

Plaintiff asserts in his brief that because of the "circumstances around Defendant failing to afford Plaintiff the same academic opportunities as other, non-disabled adults," a jury could reasonably infer that Defendant's alleged legitimate, non-discriminatory reason for terminating him was pretext. Resp. at 25. These circumstances, as discussed above, include Plaintiff's being "called out of lectures and presentations numerous times to review his requested accommodations" and the fact that "other, non-disabled cadets during the same Fire Academy were given additional leeway on the academic portions of the Fire Academy that were not

afforded to Plaintiff." Resp. at 20, 23.

This Court reviews the record in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255. Plaintiff testified that he was pulled out of "numerous lectures, reviews, physical training, house duties," but he could not remember how many times he was pulled out of lectures, or for how long he pulled out each time. Frost Dep. 63:22-64:14. Plaintiff testified that he could not recall whether he was given written materials for the lectures he may have missed. Id. at 67:2-7. Plaintiff also could not recall whether he raised a concern about being pulled out of class to anyone at the Academy, and stated he was not "aware of there being a reporting mechanism." Id. at 64:6-9, 87:1-6. Additionally, although Plaintiff asserted that he may have missed information about what topics would be covered on the protocol quiz, he could not say during his deposition whether other cadets had that information. Id. at 68:13-21.

Most importantly, Plaintiff does not contest that the reason he was pulled from class was so the City could provide for the very accommodations he requested. Id. at 66:7-12. Plaintiff has put forward no evidence that would demonstrate how Defendant's attempts to provide requested accommodations were in fact pretext.

Plaintiff has provided no reason for this Court to question Defendant's stated reason for terminating him. See e.g. Larkin v. Methacton Sch. Dist., 773 F. Supp. 2d 508, 535 (E.D. Pa. 2011) (Yohn, J.) (granting summary judgment in favor of the defendant in a disability discrimination case where the plaintiff demonstrated that the defendant's actions may have been mistaken, but failed to cast substantial doubt on the defendant's state legitimate, non-discriminatory reason); see also Terrell v. Main Line Health, Inc., 320 F. Supp. 3d 644, 660 (E.D. Pa. 2018) (Surrick, J.) (granting summary judgment in favor of the defendant in an age discrimination case where the only evidence of pretext was the plaintiff's belief that she was

discriminated against); c.f. Schneider v. Works, 223 F. Supp. 3d 308, 320 (E.D. Pa. 2016) (denying the defendant's summary judgment motion because the defendant's inconsistent explanations for the employment action, along with a supervisor's "negative comments" about defendant's health satisfied the plaintiff's burden of demonstrating pretext).

Moreover, the record demonstrates that the Academic Policy was applied evenly to all FSP cadets in the class, and that all cadets were provided an opportunity for tutoring before their re-tests. Frost failed to take advantage of that opportunity. There is no dispute of material fact as to whether Defendant's stated justification for termination was pretext. Accordingly, we will grant summary judgment on this claim.

### B. Plaintiff's failure to accommodate claim

"An employer commits unlawful disability discrimination under the ADA if [it] 'does not make reasonable accommodations to the known physical or mental limitations of an employee who is an otherwise qualified individual with a disability ...' " Conneen v. MBNA America Bank, N.A., 334 F.3d 318, 325 (3d Cir. 2003) (quoting 42 U.S.C. § 12112(b)(5)(A)). A successful failure to accommodate claim depends on the employer having been on notice that the employee desired accommodation: "'while the notice of a desire for an accommodation does not have to be in writing, be made by the employee, or formally invoke the magic words "reasonable accommodation," the notice nonetheless must make clear that the employee wants assistance for his or her disability.' " Jones v. United Parcel Service, 214 F.3d 402, 408 (3d Cir. 2000) (alterations omitted) (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir. 1999) ). Once the employer has notice of an employee's wish to be accommodated for a disability, it has an obligation to engage in "good faith" in an "interactive process" with the employee to determine what type of accommodations might be reasonable and sufficient. Taylor,

184 F.3d at 315-320. The Third Circuit has elucidated the requirements of the "interactive process," holding that both the employer and the employee "have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir. 1997).

Defendant clearly knew (and does not dispute) that Plaintiff is disabled, and Plaintiff clearly requested accommodations, as evidenced in the fourteen-point letter he sent the City on May 17, 2016. Mot. Ex. Z.

The parties argue, however, about whether Defendant engaged in a good faith interactive process to accommodate Plaintiff. Plaintiff argues that the Defendant did not provide the requested accommodations of a spinner knob apparatus to allow him to drive with a prosthetic, and his modified bunker gear and coat. Resp. at 18. Plaintiff asserts that Chief Yolanda Stallings, the person responsible for obtaining the equipment necessary to accommodate Plaintiff, admitted in a deposition that the spinner knob apparatus was never ordered, and that she could not remember whether Plaintiff's boots and coats were ordered. Id. Chief Stallings did note, however, that Plaintiff was fitted for such accommodations. Stallings Dep. at 66:2-4; 66:19-23; 73:9-19; 131:5-132:10. Plaintiff also argues that Defendant failed to accommodate his request that he be permitted to "swap out" his non-running prosthetic leg for his running prosthetic leg for physical exercises, and that his having to run on his non-running leg on the first day of training caused him temporary injury and absences. Resp. at 19. Plaintiff also asserts that he had to provide his own twenty-pound sandbag when the same was not required of other cadets. Resp. at 18.

Defendant replies that Plaintiff "was dismissed from employment before the equipment became necessary." Reply at 4. Moreover, Defendant notes that Plaintiff was "fully

accommodated" because Defendant "assigned staff to obtain this equipment and . . . Plaintiff was fitted for this equipment on multiple occasions." Id. With regards to Plaintiff's request that he be allowed extra time to swap out prosthetics, Lt. DiCicco testified that Plaintiff would let instructors know when he needed time to swap out his prosthetics, and that he was always given the extra time. DiCicco Dep., Mot. Ex II at 55:11-56:9. On the particular day where Plaintiff was injured, Defendant states that Plaintiff "failed to ask for time to switch his prosthetic." Reply at 5. Defendant also notes that Plaintiff was "not disciplined for failing to report for training the next day due to this injury." Id. Defendant contends that all cadets are required to supply their own sandbag for training purposes, and that when it learned that Plaintiff needed to use a kettle bell instead of a sandbag, the City provided a kettle bell. Reply at 5.

There is no material dispute as to whether Defendant engaged in a good faith interactive process to attempt to accommodate Plaintiff. Plaintiff admits that he was fitted multiple times for his bunker gear. See Frost Dep. at 37:14-38:1. Although it appears that Defendant failed to order the spinner knob apparatus by the time that Plaintiff was terminated, given that his termination occurred in the second week of his time at the Fire Academy, we do not find this fact sufficient to withstand summary judgment. Plaintiff points to no fact in the record demonstrating that the City did anything but attempt to accommodate his disability. Additionally, his termination was unrelated to any of his requested physical accommodations. We therefore grant summary judgment to Defendant on Plaintiff's failure to accommodate claim.

### C. Retaliation

To establish a prima facie case of retaliation under the ADAAA, a Plaintiff must show: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between

the employee's protected activity and the employer's adverse action." Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (1997). As with other forms of discrimination under the ADAAA, when an employee makes out a prima facie case, the burden then shifts to the employer to demonstrate that its adverse employment action was really the result of a legitimate, non-retaliatory reason. Id. The burden then shifts back to the employee to "convince the factfinder both the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Id. at 501. Summary judgment may be granted to the employer if the employee is unable to make out one or more elements of his prima facie case. Id.

Defendant asserts that Plaintiff's claims of retaliation must fail because there was no causal connection between Plaintiff's EEOC charge and his termination from the Fire Academy. Mot. at 13. Defendant explains that the EEOC charge was filed six months before Plaintiff was cleared to start training at the Fire Academy, and thus "[i]t defies common sense that Defendant would have medically cleared Plaintiff and granted his accommodation requests if they truly harbored resentment toward him based on his disability and his accommodation requests." Id. Given that there were nine months between the EEOC charge and termination, Defendant asserts that temporal proximity cannot give rise to a presumption of causation. Id. at 13-14.

Plaintiff responds that the City terminated him "[a]t Defendant's first opportunity— within the first two weeks of Plaintiff's employment, and after the first Protocols quiz." Resp. at 25. Thus, Plaintiff contends that a reasonable jury could infer that the City was retaliating against him for filing the EEOC discrimination charge.

The Court considers "'a broad array of evidence' in determining whether a sufficient causal link exists to survive a motion for summary judgment." LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007) (quoting Farrell v. Planters Lifesavers Co.,

206 F.3d 271, 284 (3d Cir. 2000).  The Court may consider whether the protected action and the adverse employment action are close enough in time to be "unduly suggestive." Id.  A gap of three months, "without more, cannot create an inference of causation and defeat summary judgment." Id. at 233.

Where temporal proximity is not "unusually suggestive," the Court must determine "whether the proffered evidence, looked at as a whole, may suffice to raise the inference" of causation.  Id. at 232 (citing Farrell, 206 F.3d at 280). Relevant evidence includes "intervening antagonism or retaliatory animus, inconsistencies in the employer's reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." Id. at 232–33.

Plaintiff has failed to demonstrate that there was a causal connection between his EEOC complaint in January 2016 and his termination from the Fire Academy in late September 2016, and therefore cannot make out a prima facie case of retaliation under the ADAAA. In the eight months between his EEOC complaint and termination, Plaintiff was admitted to the Fire Academy. Plaintiff has not pointed to any other evidence that would demonstrate a retaliatory animus. Because there is no issue of material fact in dispute regarding Plaintiff's retaliation claim, we will grant summary judgment in favor of Defendant.

### D.  Hostile Work Environment

In order to state a claim for hostile work environment under the ADAAA, Plaintiff must demonstrate that "he suffered intentional discrimination because of his disability; the discrimination was 'sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment'; the discrimination detrimentally affected him; and it would have detrimentally affected a reasonable person in his position." Mercer v. Se.

Pennsylvania Transit Auth., 26 F. Supp. 3d 432, 443 (E.D. Pa. 2014) (quoting Walton v. Mental Health Ass'n. of Se. Pennsylvania, 168 F.3d 661, 667 (3d Cir. 1999)) aff'd sub nom. In considering whether the behavior satisfies the "severe or pervasive" standard, "we consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance.'" Ballard-Carter v. Vanguard Grp., 703 F. App'x 149, 152 (3d Cir. 2017) (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993)). "Stray remarks" are insufficient to demonstrate hostile work environment. Hook v. Ernst & Young, 28 F.3d 366, 373 (3d Cir. 1994) (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Conner, J., concurring)).

As support for his hostile work environment claim, Plaintiff points to the behavior of Lt. DiCicco, Dr. Hayes, and others. Plaintiff states that Lt. DiCicco commented to the cadet class that burn victims "are disgusting." Resp. at 19. Plaintiff also states that DiCicco "gawked" at his leg as Plaintiff was changing in the locker room. Id. Additionally, Plaintiff asserts that a PFD captain "appeared visibly annoyed" when Plaintiff informed him that he would need to send his prosthesis for service. Id. at 20. Plaintiff also contends that he was made to complete a more rigorous physical testing when tested for evolutions. Id. Additionally, Plaintiff points to the statement from Dr. Hayes that he should "think really hard" before proceeding in his application.[5]

Defendant seeks summary judgment on this claim, arguing that Plaintiff's allegations do not rise to the level of being severe and pervasive. Mot. at 12. Defendant states that many of the

---

[5] Plaintiff does not specifically list this statement as part of his hostile work environment claim in his Response brief, but rather addresses it in the failure to hire claim. We include a discussion of it here because Defendant states that it is part of Plaintiff's hostile work environment allegations.

acts Plaintiff relies upon in stating this claim were merely "attempts by the Defendant to facilitate Plaintiff's safe participation at the Fire Academy and to educate staff on how similar situations could be handled in the future." Reply at 4. Defendant points to deposition testimony from Dr. Hayes that in making the comment to Plaintiff about "thinking hard" before proceeding, "his goal was to encourage, not discourage Plaintiff during this conversation," and testimony from Plaintiff that Dr. Hayes was professional during the conversation. Mot. at 11. With regard to Lt. DiCicco's behavior in the locker room, Defendant states that Lt. DiCicco was not gawking, but was "examining [Plaintiff] to determine if he needed medical assistance after Plaintiff potentially injured himself." Id. With regard to Lt. DiCicco's statement about burn victims, Defendant points out that "Plaintiff elaborated at deposition that DiCicco's comments regarding burn patients were made as part of a presentation designed to prepare cadets for the entire gamut of injuries they can expect to see in the field," and notes that Plaintiff has not asserted that the comment was directed toward him. Id.

The allegations made by Plaintiff—the comment by Lt. DiCicco about burn victims and Lt. DiCicco's alleged "gawking"—do not rise to the level of being severe or pervasive. Rather, they are stray remarks. See Hook, 28 F.3d at 373. The statement by Dr. Hayes that Plaintiff should "think really hard" about applying to the Fire Department is not severe or pervasive in the context of the record. The record, specifically the fact that Plaintiff was eventually admitted into the Academy, clearly demonstrates that Dr. Hayes's statement was not intended to discourage Plaintiff from entering the academy. See, e.g. Hayes Dep. 64:7-20.

Although Plaintiff testified that he believed other cadets were given tested to different standards, he stated that he was not present for other cadets' testing and that he was tested alone. Frost Dep. 47:1-51:13. Additionally, in his May 17, 2016 accommodation request letter, Plaintiff

specifically requested accommodations with the evolutions he complains of. <u>See</u> Ex. Z. More importantly, Plaintiff did not suffer an adverse employment action as a result of his ability to perform the FSP cadet evolutions.

In the context of the record, the actions by Defendant are not sufficiently severe or pervasive to withstand summary judgment on this claim.

## V.   Conclusion

There no issues of material fact in dispute and Defendant is entitled to judgment as a matter of law. Defendant's Motion for Summary Judgment will be granted.

An appropriate order follows.

O:\CIVIL 17\17-3869 Frost v City of Phila\17cv3869 MSJ Memo.docx